FILED
2015 Aug-24  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

ROGER D. YEARWOOD,                )
                                  )
            Plaintiff,            )
                                  )
v.                                )        Case No. 5:14-cv-01599-TMP
                                  )
UNITED STATES OF AMERICA,         )
                                  )
            Defendant.            )

## MEMORANDUM OPINION

The above-styled case arises from Roger D. Yearwood's ("Plaintiff")
Complaint asserting that he wrongfully was denied benefits under the Traumatic
Servicemembers' Group Life Insurance ("TSGLI") program. Before the court are
Cross Motions for Summary Judgment filed by the United States of America
("Defendant") and the plaintiff. (Docs. 6, 10). The motions have been fully
briefed. The parties have consented to the exercise of dispositive jurisdiction by
the undersigned (doc. 14); accordingly, the court enters this Memorandum
Opinion.

## STANDARD OF REVIEW

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" <u>Id.</u> at 324 (quoting former Fed. R. Civ. P. 56(e)).   The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. <u>Celotex</u>, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u> at 322.  In the instant case, the facts set forth by the parties in the cross Motion for Summary Judgment are virtually identical.  The parties are asking the court to determine a question of law – whether the decision by the Army Board for Correction of Military Records ("ABCMR") was arbitrary and capricious under the Administrative Procedure Act.

### B. Review of Administrative Decision

The plaintiff filed the instant action as a challenge to the ABCMR's affirmance of the Office of Servicemembers' Group Life Insurance's ("OSGLI") denial of his application for TSGLI benefits.  The standard of review for a decision by the ABCMR is directed by the Administrative Procedure Act ("APA"), which states, in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> . . .
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.  "Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence." Chappell v. Wallace, 462 U.S. 296, 303, 130 S. Ct. 2362, 2367, 76 L. Ed. 586 (1983).  Accordingly, to prevail in an action against the ABCMR, the burden is on the plaintiff to show that "the decision of the ABCMR was '. . . arbitrary, capricious, unsupported by evidence, or contrary to the laws and regulations. . . .'"

Nolen v. Rumsfeld, 535 F.2d 888, 889 (5th Cir. 1976),[1] quoting Hutter v. United

States, 345 F.2d 828, 829 (1965).

The Eleventh Circuit Court of Appeals elaborated upon the arbitrary and

capricious standard of review in Miccosukee Tribe of Indians of Florida v. United

States, stating:

> The arbitrary and capricious standard is "exceedingly deferential."
> Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008)
> (quotation marks omitted).  We are not authorized to substitute our
> judgment for the agency's as long as its conclusions are rational.  Id.
> We may, however, find an agency action
>
>> arbitrary and capricious where the agency has relied on factors
>> which Congress has not intended it to consider, entirely failed
>> to consider an important aspect of the problem, offered an
>> explanation for its decision that runs counter to the evidence
>> before the agency, or is so implausible that it could not be
>> ascribed to a difference in view or the product or agency
>> expertise.
>
> Alabama-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250,
> 1254 (11th Cir. 2007) (citing Motor Vehicle Mfrs. Ass'n v. State
> Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77
> L. Ed. 2d 443 (1983)).  The Supreme Court has instructed us that
> when an agency "is making predictions, within its area of special
> expertise, at the frontiers of science . . . as opposed to simple findings
> of fact, a reviewing court must generally be at its most deferential."

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981)(*en banc*), the Eleventh
Circuit Court of Appeals adopted as precedent decisions of the former Fifth Circuit rendered
prior to October 1, 1981.

Balt. Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103,
103 S. Ct. 2246, 2255, 76 L. Ed. 2d 437 (1983).

566 F.3d 1257, 1264 (11th Cir. 2009).  "[E]ven in the context of summary
judgment, an agency action is entitled to great deference.   Under the
Administrative Procedure Act, a court shall set aside an action of an administrative
agency where it is arbitrary, capricious, or an abuse of discretion," but "[t]he court
shall not substitute its judgment for that of the agency."  Preserve Endangered
Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers, 87 F.3d 1242,
1246 (11th Cir. 1996), citing 5 U.S.C. § 706(2)(A); Citizens to Preserve Overton
Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 823-24, 28 L. Ed. 2d 136
(1971).

Of particular importance when reviewing the denial of benefits administered
by the Secretary of Veterans' Affairs are the provisions of 38 U.S.C. § 5107.  The
Traumatic Servicemembers' Group Life Insurance ("TSGLI") program is
administered by the Secretary of Veterans' Affairs, and thus § 5107 is applicable to
it.  While § 5107(a) requires the veteran seeking benefits "to present and support a
claim for benefits," § 5107(b) states:

> **(b) Benefit of the doubt.**--- The Secretary shall consider all
> information and lay and medical evidence of record in a case before
> the Secretary with respect to benefits under the laws administered by
> the Secretary.  When there is an approximate balance of positive and

negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant.

In its denial of reconsideration, the ABCMR acknowledged the applicability of this standard to its review of the plaintiff's claim, saying, "[u]nder this standard, servicemember claims should not be denied unless the evidence *clearly* weighs against finding the claimant's injury is not covered by the policy." (CAR 000191) (italics added). At least one court has applied this standard to the Air Force Board for Correction of Military Records ("AFBCMR") review of a disability for a servicemember. See <u>Taylor v. United States</u>, 106 Fed. Cl. 443 (Fed. Cl. 2012), aff'd 530 Fed. Appx 963, 2013 WL 5203422 (Fed. Cir. 2013).

As an analytical framework for use in this case, § 5107(a) first requires the court to determine whether the ABCMR's conclusion that the claimant failed to "present and support" his claim is arbitrary, capricious, or unsupported by substantial evidence. That poses the question in this case whether the claimant presented substantial evidence[2] that his injury was the direct result of a "traumatic

---

[2]    In a different but comparable area of law---the review of disability claims before the Social Security Administration---"substantial evidence" is defined as "more than a scintilla, but less than a preponderance." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1223, 1239 (11th Cir. 1983). It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed 2d 842 (1971). Construing together subsections (a) and (b) of § 5107, it is apparent that the same definition of substantial evidence applies to review of TSGLI claims. Substantial evidence is something more than a mere scintilla, but it is not a preponderance, as is made clear by the benefit-of-the-doubt

event."   If so, the ABCMR's conclusion otherwise is arbitrary and capricious. Even so, the denial of benefits still can be affirmed if the record evidence preponderated against a finding that the plaintiff experienced a traumatic event that directly caused his admitted traumatic injury.   On this second step of the analysis, the court must assess whether the conclusion reached by the ABCMR that the government proved by a preponderance of the evidence that the plaintiff's injury was *not* the direct result of a traumatic event is arbitrary or capricious.

## FACTS

Ordinarily, in deciding a motion for summary judgment, the court must take the facts in the light most favorable to the non-moving party.  In the instant case, each party has filed its own motion for summary judgment and, therefore, both parties are "movants" for the purposes of summary judgment.  The facts submitted by the parties in the Motions for Summary Judgment are almost identical. Accordingly, the facts for purposes of summary judgment have been compiled from the separate Motions for Summary Judgment.  Any relevant disputed facts will be noted.

---

rule mandated in § 5107(b).  It is the Secretary who must prove by a preponderance of the evidence that the claim is due to be denied.

### A. Background

In January 2010, the plaintiff, a lieutenant colonel in the Alabama Army National Guard, was deployed to Iraq. On January 14, 2010, the plaintiff cut his right hand while clearing his M9 service weapon.[3] On January 16, 2010, the plaintiff shared meals with his Iraqi counterparts, ingesting a number of potentially contaminated local dishes. Subsequently, the plaintiff developed a mass on the right side of his chest and experienced pain in his right shoulder. The plaintiff entered care in Iraq at Camp Victory on January 17, 2010 and was treated with steroids, NSAIDs, and Tylenol. (CAR 000388).[4] Later, it was determined that he had a pyogenic infection of staphylococcus aureus bacteria, commonly known as a staph infection. The plaintiff was evacuated to Walter Reed Army Medical Center in the United States where he was eventually diagnosed with sternoclavicular osteomyelitis (bone infection) and septic arthritis (joint infection). The plaintiff was treated and discharged on February 2, 2010, but readmitted to Walter Reed on February 5, 2010, when his condition worsened. The plaintiff underwent surgery that day to drain the infection, after which he completed a regime of antibiotics.

---

[3] The M9 is a semi-automatic pistol manufactured by Beretta, designed to replace the U.S. Army's traditional .45 caliber pistol and .38 caliber revolver as a standard sidearm. See http://www.military.com/equipment/m9-pistol (August 21, 2015).

[4] On November 19, 2014, the plaintiff's certified administrative record was filed under seal. To the extent the record is referred to, it will be cited as "CAR" followed by the appropriate page number.

The mass in his chest was determined to be a large, pus-filled abscess caused by the staph infection. On February 7, 2010, the plaintiff underwent a second surgery to drain the abscess and was discharged from the hospital on February 12, 2010. Even following discharge, plaintiff continued to receive at home a daily 12-gram continuous IV infusion of nafcillin for nine weeks to combat the infection. He also required the assistance of his wife for bathing and dressing for several weeks.

### B. Insurance Claim

In April 2010, the plaintiff applied for benefits under the TSGLI program, requesting $25,000 in compensation for his inability to perform activities of daily living[5] ("ADL") for more than thirty days. The plaintiff certified that he was unable to bathe or dress independently from February 6, 2010 to March 11, 2010. The plaintiff's wife served as his non-medical assistant until March 17, 2010, assisting the plaintiff with bathing, dressing, and changing his wound dressings daily. He stated in his application, "while stationed in Camp Victory Iraq I was diagnosed with sternoclavicular osteomyelitis (septic arthritis) caused by a pyogenic infection. [The] [p]yogenic infection was most likely caused by an open wound or ingested." (CAR 000370). The plaintiff asserted that his loss resulted

---

[5] Activities of daily living are defined by the Policy as "routine self-care activities that a person normally performs every day without needing assistance." (TSGLI Procedural Guide, 17).

from either a cut he sustained to his right hand while clearing his service weapon or from ingesting local dishes with his Iraqi counterparts.  Both of these, he claims, fall within the Policy's definition of a traumatic event.  The United States Army Certifying Officer determined, however, after reviewing the plaintiff's claim, that "[t]here is no evidence that the Soldier was involved in a traumatic event."  (CAR 000368).  On June 4, 2010, the OSGLI notified the plaintiff that his claim was denied on the basis that his "loss was not a direct result of a traumatic event." (CAR 000363).  No further explanation was provided for the denial, and the letter explained the process for appealing the decision.  There was no explanation of how it was determined that neither the cut nor the ingestion of contaminated food was *not* the cause of his pyogenic infection.

On June 25, 2010, the plaintiff filed a request for reconsideration with the United States Army Human Resources Command.   In his request for reconsideration, the plaintiff described his traumatic event by stating "[w]hile serving in Iraq I was exposed to, ingested, or inhaled a contaminated substance (pyogenic bacterium) that caused physical damage to my body (PYOGENIC INFECTION) sternoclavicular osteomyelitis, septic arthritis, caused by the ingestion, absorption, inhalation or unknown exposure to a Pyogenic Bacterium. My doctors have told me that the pyogenic bacterium could have been the result of scrapes, bruises or splinters that routinely occur while serving in a combat zone."

(CAR 000326).   Also included in the request for reconsideration was a memorandum from Dr. Janet Powers of the Walter Reed Army Medical Center, stating that the plaintiff's "illness was due to a pyogenic bacterium that caused physical damage to his body (pyogenic infection) sternoclavicular osteomyelitis, septic arthritis that resulted in surgeries," and that, as a result of his illness, the plaintiff "required non-medical (NMA) assistance for more than 30 days."  (CAR 000324).  In August 2010, the United States Army Human Resources Command notified the plaintiff that his request for reconsideration was denied because his "loss was due to an illness and not a traumatic event."  (CAR 000311).  The letter gave no further explanation for the denial and informed the plaintiff of his right to appeal.  There was no explanation of how it was determined that illness and not a traumatic event was the cause of the infection.  There is no reference to any medical finding or record documenting such illness.

With the assistance of the Veteran's Law Practicum at the University of California at Berkeley School of Law, the plaintiff compiled additional documentary evidence to be included with his second appeal.  The plaintiff appealed to the United States Army TSGLI Appeals Board ("the Board") in May 2011.  The plaintiff argued that he may have contracted the infection when he cut his hand clearing his M9 service weapon, when he dined with Iraqis on native dishes, or by some other means.  On July 17, 2011, the Board informed the

plaintiff that it could not overturn the previous determination because "[p]er physician review[,] [n]o TSGLI qualifying traumatic event is identified." (CAR 000265). The Board explained that the documents provided by the plaintiff did not indicate that the loss resulted from a qualifying traumatic event. No other explanation for the denial was provided. There was no explanation of how, when, or by whom the physician's review was conducted, nor any reference to any actual findings, conclusions, or report by the reviewing physician. The letter further explained that the plaintiff could appeal the decision to the ABCMR. (CAR 00262).

In March 2012, the plaintiff asserted to the ABCMR that he was denied TSGLI benefits wrongfully due to an "incorrect interpretation of TSGLI policy language." (CAR 000260). The ABCMR denied his application, concluding that there was no indication that the plaintiff's loss resulted from a qualifying traumatic event and that it did not appear that the TSGLI decision was in error or unjust. The ABCMR notified the plaintiff of the denial in a letter dated February 14, 2013, and informed the plaintiff that he could request reconsideration if he presented new evidence or arguments not considered by the ABCMR in its original decision. On June 17, 2013, the plaintiff submitted a request for reconsideration in which he asserted that the traumatic event leading to the staph infection most likely was the cut he sustained while clearing his service weapon. He stated that, alternatively, the

infection may have resulted from the ingestion of local and "potentially unsanitary" Iraqi dishes.  The ABCMR denied reconsideration, however, finding that:

DISCUSSION AND CONCLUSIONS:

1.  The applicant contends that he is entitled to a TSGLI payment because he suffered traumatic events resulting in the loss of ADLs for 45 days.

2.  Counsel argues that the applicant's traumatic event was most likely a cut to a finger of his right hand, and/or ingestion of unsanitary food resulting in his contracting a pyogenic staph infection. Counsel further argues that the governing law requires the Board to give the applicant the benefit of the doubt.  The applicant does not need to provide a direct and absolute correlation between the traumatic event and the injury, but *only an "at least as likely as not" correlation between the proposed traumatic events and the injury.*

3.  Counsel contends that the applicant has satisfied the standard of the law by verifying two traumatic events that could directly cause his traumatic injury.  The Board erred in law by denying him his claim on the basis of a prior complained pain in the same area of his body.

4.  A review of the evidence fails to show that the cut suffered by the applicant was the catalyst for his acquiring a pyogenic staph infection.  Furthermore, there is no convincing evidence that the applicant actually ingested any unsanitary food, or that such ingestion was the cause of his infection.

5.  The applicant admits he does not know the method of inception of this infection.  The regulatory language dealing with pyogenic infections is unclear.

6. The applicant asserts that the previous ROP did not dispute that the applicant suffered a traumatic injury or scheduled loss. The ROP never reached the issue of a traumatic injury. A traumatic injury results from a traumatic event. The ROP stated that there was no evidence that the septic arthritis resulted from a qualifying traumatic event.

7. In view of the above, the applicant's request should be denied.

(CAR 000011-12) (Italics added). The ABCMR informed the plaintiff that his application was not eligible for further reconsideration and informed him that he could seek relief in a court of appropriate jurisdiction. The plaintiff has exhausted his administrative remedies, and the claim is appropriately before this court for review.

### C. TSGLI Policy

The Servicemembers' Group Life Insurance Traumatic Injury Protection Program was created by Congress to provide monetary assistance to members of the armed forces who suffer traumatic injuries resulting in certain types of losses. 38 U.S.C. § 1980A. The statute authorizes the Secretary of Veterans' Affairs to promulgate regulations more specifically setting out coverage requirements. 38 U.S.C. § 1980A(b)(1), (b)(3). These regulations state that, to be eligible for coverage, the insured "must suffer a scheduled loss that is a direct result of a

traumatic injury and no other cause."  38 C.F.R. § 9.20(d)(2).  Stemming from

these statutory and regulatory requirements, the TSGLI office published guidelines

for insureds.  Included as an attachment to the defendant's Motion for Summary

Judgment is a copy of the TSGLI Procedural Guide.[6]  (Doc. 6-2).  The instant case

deals primarily with the General Provisions section of the Procedural Guide which

states, in pertinent part:


## Part 1 – General Provisions of TSGLI

General Information

The Servicemembers' Group Life Insurance Traumatic Injury Protection (TSGLI) Program is an automatic provision under Servicemembers Group Life Insurance (SGLI).  TSGLI provides for payment to Servicemembers who are severely injured (on or off duty) as the result of a traumatic event and suffer a loss that qualifies for payment under TSGLI.  TSGLI is designed to help traumatically injured Servicemembers and their families with financial burdens associated with recovering from a severe injury.  TSGLI payments range from $25,000 to $100,000 based on the qualifying loss suffered. The benefit is paid to the member, someone acting on the member's behalf if the member is incompetent, or the members' SGLI beneficiary if the member is deceased.  TSGLI coverage was added to SGLI policies effective December 1, 2005.  All members covered under SGLI who experience a ***traumatic event*** that directly results in a ***traumatic injury*** causing a ***scheduled loss*** defined under the program are eligible for TSGLI payment.

---

[6]   The Procedural Guide provided by the defendant is Version 2.25, in force as of April 2, 2014. The defendant assures the court that there have been no substantive changes to the Procedural Guide since the plaintiff filed his initial claim.  The plaintiff has not objected to the use of the newer guide.  Accordingly, the court will evaluate the Motions for Summary Judgment as they relate to the Procedural Guide Version 2.25.

Basic Definitions

There are several terms that are key to the TSGLI program.  These terms are defined below. . . .

**External Force** – An external force is a force or power that causes an individual to meet involuntarily with an object, matter, or entity that causes the individual harm.  There is a distinct difference between ***internal*** and ***external*** forces.  "***Internal forces***" are forces acting between body parts, and "***external forces***" are forces acting between the body and the environment, including contact forces and gravitational forces as well as other environmental forces.

**Traumatic Event** – A traumatic event is the application of external force, violence, chemical, biological, or radiological weapons, accidental ingestion of a contaminated substance, or exposure to the elements that cause damage to the body.

The event must involve a physical impact upon an individual.  Some examples would include: an airplane crash, a fall in the bathtub, or a brick that falls and causes a sudden blow to the head.  It would not include an injury that is induced by the stress or strain of the normal work effort that is employed by an individual, such as straining one's back from lifting a ladder.

Physical impacts do not require penetrating injuries to occur.  Non-penetrating blast injuries, such as those common with the use of improvised explosive devises that cause concussive injuries, still involve external force and violence from the power of the blast coming into contact with an individual.

Exposure to the elements includes heat stroke and frostbite.  In such cases the severe exposure to the heat and cold are traumatic events in and of themselves.  For example, being diagnosed with heat stroke after collapsing during a physical training run in scorching temperatures would be a traumatic event.

**Direct Result** – Direct result means there must be a clear connection between traumatic event and resulting loss.

**Traumatic Injury** – A traumatic injury is the physical damage to your body that results from a traumatic event.

**Scheduled Loss** – A scheduled loss is a condition listed in the TSGLI Schedule of Losses if that condition is directly caused by a traumatic injury.  The Schedule of Losses lists all covered losses and payments amounts (see Appendix A, Schedule of Losses).

. . .

Qualifying for TSGLI Payment

Basic Requirements

In order to qualify for TSGLI payment, a member must meet all of the following requirements:

1)  The member must suffer a scheduled loss (see Part 4, Scheduled Losses) that is a direct result of a traumatic event.

. . .

Injuries Excluded From TSGLI Payment

The following Injures are excluded from TSGLI payment:

1)  Injures caused by one of the following:

. . .

b) A mental or physical illness or disease, (not including illness or disease caused by a pyogenic infection, biological, chemical, or radiological weapon, or accidental ingestion of a contaminated substance.)

. . .

Certain exclusions and terms above warrant additional explanation.

. . .

**Pyogenic infection** – a pyogenic infection is a pus forming infection, often caused by a wound.

Example: A member is injured in a car accident.  She suffers injuries to her leg.  Unfortunately, her wounds develop a pus-forming infection (pyogenic infection) and spread gangrene up her leg resulting in the loss of her leg.  The member's loss would be covered by TSGLI.

. . .

**Contaminated Substance** – food or water made unfit for consumption by humans because of the presence of chemicals, radioactive elements, bacteria, or organisms.

Example: A member serving in Iraq is involved in a skirmish with enemy forces.  He is forced to wait out the enemy for three days in a remote area.  He only has a one-day supply of water.  In order to survive, he drinks water from a small stream nearby.  After escaping from his hiding place, the member returns to his base and becomes ill with vomiting, diarrhea, and a fever.  After a number of days with these symptoms, the member falls into a coma for 20 days.  It is determined that the illness causing the coma was a result of drinking contaminated water from the stream.  The member's loss would be covered by TSGLI.

(Doc. 6-2, pp. 4, 6-8) (emphasis in original).  The loss alleged by the plaintiff is

listed under the Policy's Schedule of Losses as "Activities of Daily Living"

("ADL").  (Doc. 6-2, p. 15).  The Policy describes ADL as "routine self-care

activities that a person normally performs every day without needing assistance."
(Id. at 17).   The Policy identifies "six basic ADL:   eating, bathing, dressing,
toileting, transferring (moving in and out of bed or chair) and continence
(managing or controlling bladder and bowel functions)." (Id.) The plaintiff claims
in his applications for benefits that he was unable to bathe and dress without
assistance for a period of more than thirty days.   The Policy explains that "[a]
member is considered to have a loss of ADL if the member **REQUIRES**
**assistance** to perform at least two of the six activities of daily living."   (Id.)
(emphasis in original).

## DISCUSSION

The essential issue in the instant motions is whether the ABCMR's
determination that the plaintiff did not establish that his injury was the direct result
of a traumatic event was arbitrary and capricious, an abuse of discretion,
unsupported by substantial evidence, or contrary to laws and regulations.   At the
heart of the ABCMR's rejection of plaintiff's claim appears to be its reliance on
the determination by the TSGLI Board that plaintiff's application for benefits
should be denied because "per physicians review, your loss was due to an illness
and not a traumatic event."   (CAR 000311).   In a letter dated April 24, 2014, the
ABCMR informed the plaintiff that "the Board denied [his] request for relief."

(Doc. 17-1, p. 6).  The included record of the ABCMR's proceedings explained the

reasons for denying the plaintiff's request for reconsideration as follows:

> 4. A review of the evidence fails to show that the cut suffered by the applicant was the catalyst for his acquiring pyogenic staph infection. Furthermore, there is no convincing evidence that the applicant actually ingested any unsanitary food, or that such ingestion was the cause of his infection.
>
> 5. The applicant admits he does not know the method of inception of this infection.   The regulatory language dealing with pyogenic infections is unclear.
>
> 6. . . .The ROP stated that there was no evidence that the septic arthritis resulted from a qualifying traumatic event.
>
> 7. In view of the above, the applicant's request should be denied.

(Doc. 17-1, pp. 16-17).

The plaintiff argues in his Motion for Summary Judgment that the

ABCMR's decision was arbitrary and capricious because there was substantial

evidence that the potential sources of his infection---a cut on his hand and

ingestion of potentially contaminated food---each fall within the Policy definition

of a "traumatic event" and that the Board had no substantial basis for finding

otherwise.  The plaintiff asserts three ways he may have contracted the pyogenic

infection: a cut he sustained while clearing his M9 service weapon; dining on local,

potentially contaminated dishes with his Iraqi counterparts; and scrapes, bruises, or splinters that routinely occur while serving in a combat zone.  The plaintiff argues that each is a traumatic event contemplated by the Policy and the ABCMR's denial of his application for benefits because he cannot prove which event resulted in his infection is arbitrary and capricious.

It is on this question the court believes the ABCMR has committed an error of law by applying the wrong burden of proof when determining whether the plaintiff has proven that his traumatic infection was the direct result of a traumatic event.   The ABCMR required the plaintiff to prove his assertion by a preponderance of the evidence, rather than merely by substantial evidence, and in so doing, erroneously reversed the burden of proof by failing to give the plaintiff the benefit of the doubt as required by § 5107(b).

Section 5107 consists of two subsections.  Subsection (a) requires the claimant for veterans' benefits to "present and support [his] claim for benefits," while subsection (b) requires the Secretary of Veterans' Affairs to give the claimant the "benefit of the doubt" when "there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter."  Read together, these two subsections establish the relative burdens of proof to be used in determining a claim for veterans' benefits.  Because the claimant is entitled to the "benefit of the doubt" whenever the evidence is in

equipoise, § 5107(a) clearly does not require the claimant to prove his claim by a preponderance of the evidence. Applying a preponderance of evidence burden to the claimant renders § 5107(b) meaningless. Requiring the claimant to prove his claim "to be more likely true than not true,"[7] contradicts the careful balance established in § 5107(b), under which all matters on which the evidence is in "approximate balance" goes to the claimant. The burden of proof established by § 5107 requires the claimant to make an initial presentation of his claim and support it with *substantial* evidence, something more than a mere scintilla but less than a preponderance. Once the claimant meets this substantial-evidence burden, he is entitled to the benefit of the doubt as to every matter on which the evidence is in "approximate balance."[8]

In this case, the ABCMR applied the wrong standard of proof to the question of whether plaintiff's clearly traumatic injury was the direct result of a traumatic

---

[7]  See Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California, 508 U.S. 602, 622, 113 S. Ct. 2264, 2279, 124 L. Ed. 2d 539 (1993) ("The burden of showing something by a 'preponderance of the evidence,'… 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence …."'"),citing and quoting In re Winship, 397 U.S. 358, 371–372, 90 S. Ct. 1068, 1076, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring) (brackets in original) (citation omitted)); LaFleur v. Wallace State Community College, 955 F. Supp. 1406, 1411 (M.D. Ala. 1996) ("A preponderance of the evidence means such evidence as, … demonstrates that what is sought to be proved 'is more likely true than not true.'").

[8]  Although the claimant need only "support" his claim with substantial evidence, it would seem self-evident that if the evidence material to a matter preponderates in his favor, he prevails on that matter. Thus, the impact of § 5107(b) is to "break the ties." Only when the claimant's evidence falls below an "approximate balance" with the evidence contradicting it does he lose.

event.   Although the ABCMR acknowledged the "benefit of the doubt" rule enacted by § 5107(b), it misapplied it by effectively equating it to a preponderance of the evidence standard.   In its denial of reconsideration, the ABCMR stated on the question of the source of plaintiff's pyogenic infections, "The applicant does not need to provide a direct and absolute correlation between the traumatic event and the injury, but only an 'at least as likely as not' correlation between the proposed traumatic events and the injury."   What the ABCMR failed to recognize is that, once the claimant proves at least an "approximate balance" in the evidence, the burden shifts to the *Secretary* to show by a preponderance of the evidence that the infection was *not* the direct result of a traumatic event.   Ties go to the plaintiff.

As explained below, the court believes the plaintiff's evidence created an "approximate balance" as to whether his traumatic pyogenic infection was the direct result of a traumatic event, and the Secretary failed to rebut that balance by a preponderance of the evidence.

## A.   *Do the Potential Sources of Infection Constitute "Traumatic Events"*

The plaintiff has asserted three ways he may have contracted the pyogenic infection that resulted in his loss: (1) he cut his hand while clearing his service weapon, (2) he dined on potentially contaminated local dishes with his Iraqi counterparts, and (3) he sustained routine cuts and scrapes that are common while living in a combat zone.   The plaintiff has not, and likely cannot, prove which

caused of his pyogenic infection.  Each of the alleged traumatic events occurred while the plaintiff was covered by the Policy.  The defendant argues that none of the events constitute a "traumatic event" and, therefore, the plaintiff is not entitled to coverage no matter which event was the source of the infection.

### 1.  Cut on Hand

On January 14, 2010, the plaintiff cut his right hand while clearing the barrel of his service weapon.  The defendant argues that the ABCMR's decision that the plaintiff "failed to establish that a cut on his hand constituted a 'traumatic event'" was sufficient to deny plaintiff's claim.  (Doc. 6-1, p. 16).  To qualify for coverage under the Policy, the insured "must suffer a scheduled loss . . . that is a *direct result* of a *traumatic event*."  (Doc. 6-2, p.8) (emphasis added).  Under the Policy, "[a] traumatic event is the application of external force, violence, chemical, biological, or radiological weapons, accidental ingestion of a contaminated substance, or exposure to the elements that causes damage to the body," and external force is defined as "a force or power that causes an individual to meet involuntarily with an object, matter, or entity that causes the individual harm."  (Doc. 6-2, p. 6).  Finally, under the Policy, "[d]irect result means there must be a clear connection between traumatic event and resulting loss."  (Doc. 6-2, p. 7).

An accidental cut sustained while manipulating a weapon falls squarely within the definition of a traumatic event.  The slide mechanism of the weapon

applied external force to the plaintiff's hand, causing harm.  There is no contention or indication that the plaintiff voluntarily cut his hand, which would except the loss from coverage.  The plaintiff's original claim was denied because the "loss was not a direct result of a traumatic event."  (CAR 00363).  His reconsideration request was denied because his "loss was due to an illness and not a traumatic event." (CAR 000311).  The plaintiff's appeal was denied because "[t]he documentation provided did not indicate that [he] suffered a loss resulting from a qualifying traumatic event."  (CAR 000262).  Finally, the ABCMR denied the plaintiff's appeal because there was no indication that his loss "resulted from a qualifying traumatic event."  (CAR 000179).  None of these decisions attempted to distinguish an accidental cut from qualifying traumatic events, but simply concluded that no traumatic event occurred.

If the ABCMR's denial was based on the determination that the cut to the plaintiff's right hand was not the result of a traumatic event, the decision was arbitrary and capricious.  An incident causing a cut so clearly falls within Policy parameters that any other determination is a blatant disregard of the Policy guidelines themselves.  There can be no question that the slide mechanism of the weapon applied external force to plaintiff's hand, the force was involuntary, and it resulted in harm to him.  That the cut appeared minor at the time does not dispense with his claim if the infection developed directly from it.  The most reasonable

interpretation of the denial is, therefore, that the ABCMR and other agencies denied the plaintiff's claim because the plaintiff did not prove that the pyogenic infection was a *direct result* of the cut to his hand.  The question, therefore, is not whether the cut was a traumatic event as defined by the Policy, but whether the plaintiff showed that the infection was a "direct result" of the cut.  The issue of direct result will be discussed *infra*.

### 2.  *Contaminated Food*

As stated above, the Policy definition of "traumatic event" includes "accidental ingestion of a contaminated substance."   The Policy includes the following example of a covered loss resulting from ingesting a contaminated substance:

> **Example:** A member serving in Iraq is involved in a skirmish with enemy forces.  He is forced to wait out the enemy for three days in a remote area.  He only has a one-day supply of water.  In order to survive, he drinks water from a small stream nearby.  After escaping from his hiding place, the member returns to his base and becomes ill with vomiting, diarrhea, and a fever.  After a number of days with these symptoms, the member falls into a coma for 20 days.  It is determined that the illness causing the coma was a result of drinking contaminated water from the stream.  The member's loss would be covered by TSGLI.

(Doc. 6-2, p. 10).  The plaintiff asserts that he dined on potentially contaminated Iraqi food many times as part of his contact with Iraqi counterparts.  The defendant

27

argues in the Motion for Summary Judgment that there is no evidence that the plaintiff actually ingested contaminated Iraqi cuisine or that anyone else who dined with the plaintiff contracted a similar infection. The court agrees that plaintiff's evidence fails to show any actual contamination of the food he ingested. Even the plaintiff can state only that the Iraqi food was "potentially" contaminated, and he offers nothing beyond speculation about the wholesomeness of the food. There is no evidence that other Americans dining on the same food suffered *any* illness, much less a staph infection of the type plaintiff contracted. Absent some evidence that the Iraqi food was, in fact, contaminated, the ABCMR's rejection of the claim in this basis was not arbitrary or capricious.

### 3. Routine Cuts and Scrapes

The plaintiff's original claim for benefits proposed as the source of infection either the cut or ingestion of contaminated food, not routine cuts and scrapes. The plaintiff did, however, state in his request for reconsideration that doctors indicated to him that routine cuts and scrapes sustained by the plaintiff while serving in a combat zone was another potential source of infection. The defendant's Motion for Summary Judgment argues that, even if routine cuts and scrapes are shown to be the direct cause of the pyogenic infection, the loss is not covered because "routine injuries" do not fall within the Policy's definition of a "traumatic event." There is nothing in the Policy, however, supporting this contention. There is no

exclusion within the Policy that directly prevents routine injuries from being covered.  The Policy states that a traumatic event "would not include an injury that is induced by the stress or strain of the normal work effort that is employed by an individual, such as straining one's back from lifting a ladder."  (Doc. 6-2, p. 6).  However, this language is intended to distinguish between applications of "internal" forces and "external" forces.  So long as the force causing injury is external to the claimant and involuntary, it meets the definition of an "external force" causing harm to the claimant.  Despite the defendant's argument that routine cuts and scrapes are similar to "stress or strain," cuts and scrapes, however routine, are not caused solely by the inner workings of the body.  It seems well beyond dispute that, if a soldier on patrol in a combat zone, trips, falls, and scrapes his hand, and that scrape leads to a serious infection, the simple act of tripping and falling constitutes a traumatic event.[9]

The United States also argues that, because scratches and scrapes are not as "serious" as the examples of traumatic events listed in the Procedural Guide, they cannot fit within the definition of traumatic event.  The Procedural Guide lists the following examples of traumatic events:

---

[9]   Of course, not every "traumatic event" results in a "scheduled loss."  It is only when such a simple injury as a cut or scrape develops into something defined by the Policy as a "scheduled loss" that benefits are payable.

- Military Motor Vehicle Accident
- Military Aircraft Accident
- Civilian Motorcycle Accident
- RPG Attack
- IED Attack
- Civilian Motor Vehicle Accident
- Civilian Aircraft Accident
- Small Arms Attack
- Training Accident (Please clarify with additional description)

(Doc. 6-2, p. 49).   The Procedural Guide states that the examples of traumatic events "include" the list above.  It does not indicate that the list is intended to be exhaustive.  The guide also lists as traumatic events "a fall in the bathtub, or a brick that falls and causes a sudden blow to the head."  (Id. at 4).  There is nothing in the Policy that requires a "traumatic event" to meet some minimum threshold of violence, only that it be the involuntary application of external force causing injury.  Also, just because an injury initially seems minor or routine, does not mean it is.  Very serious infections are known to result from minor cuts and scrapes.  For that reason, the Policy does categorically exclude "routine" cuts and scrapes as traumatic events that might lead directly to a traumatic injury.  The fact that routine injuries are not specifically described as traumatic events in the Policy does not mean that the Policy excludes such injuries.

To further support its position, the United States cites <u>Fail v. USA</u>, 2013 WL 5418169 (D. Colorado September 27, 2013).  The case, although not reported or otherwise binding precedent, provides analysis for an incident similar to the case at bar.  In <u>Fail</u>, one of the plaintiffs, Ms. Truax, cited as the traumatic event resulting in her loss "an injury in October 2009 when she bumped into a countertop . . . suffering an injury to her hip."  2013 WL 5418169 at *12.  Ms. Truax ultimately underwent surgery and was unable to complete ADL for a period of more than 30 days.  As in the instant case, the Army denied her claim because her injury was not the result of a traumatic event.  <u>Id.</u>  The district court provided the following reasoning for upholding the Army's decision:

> [T]he question on Ms. Truax's claim is whether bumping into a solid object while walking constitutes a [sic] "the application of external force" for purposes on [sic] § 9.20(b)(1).  There is nothing in the record or the parties' briefs that offers any particular guidance on the definition of the term "external force."   The Court notes that Mr. Andersonn's injury – hurting his knee due to an inartful landing after jumping off an obstacle -- is at least conceptually similar to Ms. Truax's, insofar as there was not a separate causal agent involved (*e.g.* another motorist, a projectile, etc.).  Since the Army did not reject Mr. Andersonn's claim on the grounds that his injury was not the result of a traumatic event, the Court will assume that the Army draws some distinction between the two sets of circumstances.  It would seem to the Court that the distinguishing characteristic must necessarily be height (or its partner, gravity).  In other words, Mr. Andersonn's injury was the result of him [sic] jumping from a height, with gravity being the "external force" that accelerated his movement and caused him to suffer the injury upon impact.  *See also*

Mr. Melson, *infra*.  Ms. Truax, on the other hand, was simply walking – motivated by her own internal force – when her impact occurred; that is, her impact with the countertop was not attributable, in whole or part, to Ms. Truax being accelerated beyond her normal walking speed by some external force (*e.g.* sliding on a wet floor, or tripping and falling forward into the countertop, or being pushed by another person).

Although the distinction is somewhat abstract, the Court cannot say that the Army's construction of the phrase "application of external force" in this situation is arbitrary or capricious.

Fail v. USA, 2013 WL 5418169, *12-13 (D. Colorado September 27, 2013).

Under the reasoning of Fail, routine scratches and scrapes obtained in a combat zone may or may not meet the Policy's definition of a traumatic event, depending upon the circumstances under which the scrape or cut occurred.  If an "external force" caused the scrape or cut, "such as tripping and falling forward" where the force of gravity comes into play, it may be a "traumatic event."  But, like bumping into a countertop, where no external force accelerated the claimant's motion, the event may not meet the "external force" requirement to be a traumatic event.  In the instant case, however, the record does not indicate that the reasoning hypothesized in Fail was the reasoning used by the ABCMR.  Although the reasoning of the District of Colorado is sound, it is not binding upon this court.

The Policy defines traumatic event as "the application of external force . . . that cause damage to the body," and further specifies that "[t]he event must involve

a physical impact upon an individual."  Further, "[a]n external force is a force or power that causes an individual to meet involuntarily with an object, matter, or entity that causes the individual harm."  Merriam-Webster's Collegiate Dictionary defines "force" as "strength or energy exerted or brought to bear; cause of motion or change; active power."  Using the common definition of "force," it seems that the external force must be applied by either a moving object (e.g. a brick falling, projectile, moving vehicle) or a force such a gravity that causes motion.  The force required to sustain routine scratches and scrapes may or may not be akin to "internal force," defined by the Policy as "[f]orces acting between body parts." Following the definitions to their natural conclusions, it appears that routine scrapes and scratches may or may not be the result of internal forces – walking or moving that results in the body brushing against something that scrapes it.  But a scraped knee from an involuntary fall can be the result of an external force, i.e. gravity.

In the instant case, there is no evidence (other than the cut caused by the sliding mechanism of plaintiff's service weapon) describing the circumstances under which an external force, such as gravity, working on the plaintiff's body forced it against an object causing the scratches and scrapes.  Plaintiff can only state that he sustained "routine scrapes and cuts."  Without some greater description of the circumstances under which they were sustained, plaintiff's

evidence on this cause does not meet the burden of "supporting" his claim with at least substantial evidence.   Accordingly, the routine scratches and scrapes described by plaintiff in this case do not fall within the Policy definition of traumatic events.

For this reason, a decision by the ABCMR that the infection was not a result of a traumatic event if it was the result of routine scratches and scrapes was not arbitrary or capricious.  However, the ABCMR did not reject plaintiff's claim on the basis that the infection was a result of routine scratches and scrapes.  The ABCMR's reasoning was that the plaintiff did not show that his injury was a "direct result" of *any* traumatic event, not that a traumatic event did not occur or that the loss was caused by something other than a traumatic event.  Because the plaintiff offered substantial evidence that at least one potential source of infection (the cut to his hand while clearing his weapon) meets the Policy's definition of a traumatic event, the fact that his assertion of routine scrapes and scratches does not prove a traumatic event is not enough on its own to affirm the decision of the ABCMR.

### B. Direct Result

The primary reasoning in both the ABCMR's decision and the defendant's Motion for Summary Judgment seems to be that the plaintiff cannot present

evidence proving that the pyogenic infection was a *direct result* of the cut on his hand.  The Policy requires that, to be covered, "there must be a clear connection between "traumatic event and resulting loss."  (Doc. 6-2, p. 4).  The Policy does not specify what constitutes a "clear connection."  The difficulty, of course, comes from the fact that, no matter the circumstance, it would be difficult or impossible ever to determine definitively where a pyogenic infection was contracted.  The Procedural Guide includes the following example of a pyogenic infection that would be covered by the Policy:

> **Example:** A member is injured in a car accident.  She suffers injuries to her leg.  Unfortunately, her wounds develop a pus-forming infection (pyogenic infection) and spread gangrene up her leg resulting in the loss of her leg.  The member's loss would be covered by TSGLI.

(Doc. 6-2, p. 9).  The example does not state that the pyogenic infection was determined to have been contracted at the time of the accident.  In reality, the infection could have been contracted in some way unrelated to the accident and simply spread to the leg after the accident.  The accident is, however, the most likely point of contraction.  The difficulty in pinpointing the precise time and location of infection means that such a determination necessarily is made on probabilities.

In its "Discussion and Conclusions," the ABCMR notes that the evidence presented by the plaintiff "fails to show that the cut suffered by the applicant was the catalyst for his acquiring a pyogenic staph infection." (CAR 000011). The ABCMR further notes that "[t]he applicant admits he does not know the method of inception of this infection," and "[t]he regulatory language dealing with pyogenic infections is unclear." (Id.) The ABCMR's determination was that "[t]he evidence presented does not demonstrate the existence of a probable error or injustice. Therefore, the Board determined that the overall merits of this case are insufficient as a basis to amend the decision of the ABCMR set forth in Docket Number AR20120005269." (Id. at 17).

In order to overturn the decision of the ABCMR, its decision must be arbitrary, capricious, contrary to law, or an abuse of discretion. The ABCMR is correct that the evidence does not *conclusively* prove the source of the pyogenic infection. The question, however, is whether it is an abuse of discretion to deny a motion for reconsideration for the failure to prove a practically unprovable fact. The plaintiff has set out at least one plausible traumatic event that could have resulted in his infection, a cut on his hand sustained while clearing his service weapon. A pyogenic infection is not the type of traumatic injury that can be attributed to a definite source, despite the glib example of an infection following after a automobile accident. Because the source of a pyogenic infection cannot be

proven to a certainty, the decision-makers under the Policy must weigh whether the traumatic event asserted was the *likely* cause of the infection.

The plaintiff's situation is analogous to an example of covered losses set forth in the Policy: the example of the insured injured in a car accident who contracted a pyogenic infection in her wounded leg.  (Doc. 6-2, pp. 7-8).  The plaintiff's injury is simply less traumatic that that suffered by the insured member in the car-accident infection.  The plaintiff suffered a wound to the hand and subsequently developed within days a pyogenic infection in the same arm where the wound occurred.  The circumstantial evidence of the cut suffered on plaintiff's hand, the "dirty" condition of the weapon in a combat zone, and the development of symptoms of infection within days after the cut occurred all suggest a link between the cut and the staph infection that is enough to meet the burden of "supporting" the claim with substantial evidence.  In the absence of preponderating evidence of a different cause, plaintiff is entitled to the benefit of the doubt.

Despite the high level of deference that this court must show for the ABCMR's determination, the deference is not without limits.  A finding that the cut to the plaintiff's hand was not a traumatic event within the contemplation of the Policy is contrary to the language of the Policy.  Further, the finding that the pyogenic infection was not a direct result of the traumatic event because the plaintiff could not prove with certainty the source of infection, was an abuse of

discretion.  Requiring proof of the exact point and source of a pyogenic infection is an unreachable hurdle and, therefore, a denial based on the failure to overcome that hurdle is arbitrary and capricious.

### C. Loss Due to Illness

Leading up to the ABCMR's denial of reconsideration, the TSGLI Appeals Board determined that the plaintiff's request for benefits was due to be denied because the traumatic injury resulting in the scheduled loss was due to an illness and not a traumatic event.  Although the TSGLI Board offered no explanation of its reasoning, the determination may have been based on references in the plaintiff's medical records to shoulder pain beginning in 2009.  To qualify for coverage, the insured's traumatic injury and resulting scheduled loss must be the direct result of a traumatic event.  Therefore, a scheduled loss resulting from an illness would not qualify for coverage.  Policy exclusions include "physical illness or disease, (not including illness or disease caused by a pyogenic infection, biological, chemical, or radiological weapon, or accidental ingestion of a contaminated substance.)"  (Doc. 6-2, p. 6).  The Policy further explains that "a pyogenic infection is a pus forming infection, often caused by a wound."  (Id. at 7).

The plaintiff's medical report from the theater clinic on January 17, 2010, states that the reason for the plaintiff's visit is a "shoulder sprain" and that the

plaintiff is experiencing "joint pain, localized in the shoulder." (CAR 00385). The record sets out the history of the plaintiff's complaint, stating:

> The pt is a 54 y/o activated National Guard w/ c/o right shoulder pain, mass in right chest at sternoclavicular joint since 2nd week of Nov 09 while in US. Pt saw physicians at the time who noted possibility of a tumor but thought the mass was more likely an arthritic flare and gave the patient Mobic and steroids w/reduction of the mass and pain at the time. The pt notes that he has had some pain/discomfort in shoulder but it has worsened since he came to theater 10 days prior.

(Id.) The physician's comments further stated "doubt infections process since pt previously improved on steroids more likely arthritic inflammatory process. (CAR 000388). The plaintiff was prescribed steroids and Tylenol for pain, but no antibiotic. (Id.)

The plaintiff's medical records February 4, 2010, at NNMC Bethesda, Maryland, state that the plaintiff was referred from his primary care physician on request for a biopsy of "a sternoclavicular mass." (CAR 000392). The records state that the pain

> started in November of last year.  At the time, he thought it was a pulled muscle.  He took NSAIDs and it subsided.  Approximately 3 weeks ago, it returned.  He denies any inciting trauma.  He states that it has since been growing in size and it's painful."

(Id.)   The plaintiff confirmed "fevers/chills/night sweats and a 15-20 lb weight loss over the past 6 months." (Id.)   The records noted that the plaintiff would undergo a surgical biopsy as early as the next day, February 5, 2010, and the physician recommended a follow-up CT scan in six months. (CAR 000397).  The lab results from a needle biopsy ordered on January 29, 2010, showed no bacterial growth after 72 hours. (CAR 000395).

The plaintiff's February 19, 2010, medical records describe the plaintiff as having "[a] recent severe illness or injury symptoms started Nov 2009 with pain [in the right] sternoclavicular area, worsened after early Jan deployment to Baghdad." (CAR 000398).  The records further state that, after biopsies failed to determine the etiology of the mass in the plaintiff's shoulder, the plaintiff underwent a surgical biopsy and drainage on February 5, 2010, and pus was found. (CAR 000398).  The records note that the pus grew Methicillin-Sensitive Staphylococcus Aureus ("MSSA") that was resistant to azithromycin and clindamycin.  The plaintiff had a repeat incision and drainage on February 7, 2010, and was discharged from the hospital on February 12, 2010, with intravenous antibiotics. (Id.)  The physician's assessment of the plaintiff was chronic osteomyelitis, septic sternoclavicular joint, and staphylococcus aureus.  The physician's assessment from February 26, 2010, states that she "believe[s] some of his shoulder pain is not related to infection, although could have been exacerbated by same." (CAR 000401).

The plaintiff returned in April 2010 for a follow-up appointment regarding his sternoclavicular osteomyelitis and he had "been on iv antibiotics for nine weeks now and is scheduled to stop tomorrow."   (CAR 000405).   The physician "explained to LTC Yearwood that the infection may return, at which point I recommen[ded] a resection of sternoclavicular joint and wide drainage.   I have given LTC my contact information and asked him to call me directly should signs of infections return."   (Id.)   The plaintiff's April medical records note an "unknown underlying source of infection," and that the plaintiff is still reporting "severe pain in the anterior right shoulder region."  (CAR 000409).   The physician's assessment states that the plaintiff has "cubital tunnel syndrome" on his right side.  (Id.)

The regulations governing TSGLI coverage require that the insured "suffer a scheduled loss that is a direct result of a traumatic injury and no other cause."  38 C.F.R. § 9.20(d)(2).   Under the claims portion of Title 38 of the United States Code---the Title under which TSGLI was created---it is mandated that the Secretary, when considering a claim, "shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary.   When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary **shall** give the benefit of the doubt to the claimant."   38 U.S.C. § 5107(b) (emphasis added).  The ABCMR acknowledges this requirement

in its evaluation of the plaintiff's claim.  (CAR 000010).  Thus, where the evidence is in "approximate balance" the plaintiff is entitled to the benefit of the doubt on the question of the causal link between his cut hand and the infection in his shoulder.

The United States Court of Appeals for Veterans Claims discussed the application of the "benefit of the doubt requirement" in an analogous situation involving the arguable causal link between Post-Traumatic Stress Disorder and alcoholism:

> However, as the Board noted, the examiner's rationale for causation was based on his finding that although his literature review indicated a link between PTSD and alcohol dependence, it "did not reveal scientific evidence that PTSD causes alcohol dependence." R. at 12. In relying on this medical opinion, the Board did not explain how, given the evidentiary standards applicable in the veterans law context, this rationale—which appears to require nothing less than definitive scientific evidence establishing causation—was adequate to support a conclusion applying the "at least as likely as not" standard. *See Wise v. Shinseki,* 26 Vet. App. 517, 531 (2014) (noting that rather than mandate that "a medical principle reach the level of scientific consensus in order to support a claim for VA benefits," Congress established a low standard in 38 U.S.C. 5107(b) authorizing VA to resolve scientific or medical questions in the claimant's favor when the positive and negative evidence is in "approximate balance"); *see also Jones v. Shinseki,* 23 Vet. App. 382, 388 n. 1 (2010) (noting that in the veterans benefits system, the benefit of the doubt on any material issue goes to the veteran if the evidence is in equipoise and the burden of nonpersuasion is with VA).

Delano v. McDonald, No. 14-0338, 2014 WL 7358381, at *3 (Vet. App. Dec. 29, 2014).  As in the instant case, the Board in Delano required a level of proof that amounted to "definitive scientific evidence establishing causation."  Id.  In the instant case, the ABCMR issued its denial on the basis that the plaintiff failed to prove that one of the traumatic events he experienced was the definitive cause of his traumatic injury.  In Delano, the plaintiff failed to provide "scientific evidence that PTSD causes alcohol dependence."  Id.  While the ABCMR in the instant case did not go so far as to say that the plaintiff must show "scientific proof" of the origin of his pyogenic infection, the court fails to see what other type of evidence the plaintiff could present to satisfy the ABCMR's requirement for proof of causation.  Plaintiff offered his own and testimony of others to the fact that he cut his hand accidently on January 14, 2010, on his M9 firearm.  The conditions in a combat zone are not sanitary, and he developed a serious staph infection within days or weeks afterward.  While this is not direct evidence of the origin of the infection, it is sufficiently circumstantial to be substantial evidence of it.

Furthermore, the ABCMR did not make a determination that the evidence preponderates against the plaintiff.  In the ABCMR's original denial, it notes in the Discussion and Conclusions section that "[t]he evidence in this case shows the applicant suffered from pain in his right sternoclavicular area in November 2009, which worsened after his early January deployment to Baghdad, and received

surgery for sternoclavicular ostesomyelitis (septic arthritis) caused by a pyogenic infection.    There is no indication this condition or his sternoclavicular ostesomyelitis (septic arthritis) resulted from a qualifying traumatic event." (CAR 000064).  Although, as illustrated by the plaintiff's medical records, summarized above, that the plaintiff began having shoulder pain in November 2009 in the area where the pyogenic infection later was found, this fact alone does not overcome the "benefit of the doubt" requirement set forth in 38 U.S.C. § 5107.  Westlaw's treatise on Federal Procedure provides a helpful discussion on the review of the application of the "benefit of the doubt" doctrine:

> When findings of material facts by the Board are properly supported and reasoned and the Board concludes that a fair preponderance of evidence exists against the claim of the veteran, it is not error for the Board to deny the veteran the benefit of the doubt.  On the other hand, there may be a few cases in which a conclusion by the court that actual findings by the Board are not clearly erroneous would not determine the "benefit of the doubt" issue.   While there may be support in the record for the Board's findings, there also may be evidence which supports a contrary conclusion; indeed, there may be two permissible views.   If such evidence is in the record and the Board fails to include an adequate statement of reasons or basis for its findings or its conclusions, either implicit or explicit, that the veteran was not entitled to the benefit of the doubt, the Board's determination as to the benefit of the doubt may well be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and a remand or, in the rare case, reversal will be required.

33 Fed. Proc. L. Ed. § 79:393.  Such is the case here.  Although the evidence pre-deployment pain cited by the ABCMR exists, the ABCMR did not adequately determine that there was a preponderance of evidence against the plaintiff's claim. The medical evidence of pain in the plaintiff's shoulder beginning in November 2009 is at least as equivocal as the evidence that infection began in January 2010. The November pain subsided with steroids and pain medication, and with no active treatment for infection with antibiotics.  The treating physician in the combat theater "doubt[ed]" that plaintiff's November pain was the result of infection for this very reason.  (CAR 000388).  It is unlikely that a serious staph infection existing in November 2009 could go untreated for two months until discovered in February 2010.  As that physician explained, the more likely explanation for plaintiff's November pain was an "arthritic flare," not a staph infection.  Further, a needle biopsy of the sternoclavicular mass failed to reveal any bacterial infection, which was discovered only after surgical intervention.

The ABCMR did not adequately address why the "benefit of the doubt" doctrine was not applied.  In the instant case there are two permissible views of the evidence relating to the cause and origin of the infection, and the onus is on the Secretary to show why the plaintiff's view of the evidence is not correct under the benefit-of-the-doubt rule provided under 38 U.S.C. § 5107.  The evidence of a

cause other than as described by the plaintiff must preponderate in order for plaintiff to be denied TSGLI benefits.

The evidence regarding the plaintiff's pain in November 2009 does not negate the plaintiff's assertion that the pyogenic infection which caused his loss was the result of the cut to his hand. The medical records prior to the plaintiff's February 5, 2010 surgery do not address the possibility of infection. The plaintiff was not prescribed antibiotics and, in fact, the physician in the theater clinic expressed doubt that the plaintiff's pain was due to an infection because the pain the plaintiff complained of in 2009 improved with steroids. The physician noted his belief that the more likely cause of the plaintiff's pain was an arthritic inflammatory process. It was later discovered, after a surgical biopsy, that the plaintiff had MSSA. Only at that point was the plaintiff treated with antibiotics. Although the medical records show that the plaintiff previously had pain at the site where infection later was found, the records do not indicate that the plaintiff was suffering from an infection in November 2009. The records tend to negate that argument because he was prescribed anti-inflammatory medication and steroids, which improved the pain. Further, the plaintiff's physician noted in February that some of the plaintiff's shoulder pain was not related to the infection, but that the infection could have exacerbated pain that already was present. In April the plaintiff's physician noted that the underlying cause of the infection remained

unknown.   The plaintiff's medical records do not create a preponderance of evidence against the plaintiff's evidence that his pyogenic infection originated after his deployment to Iraq.

In light of the fact that the positive and negative evidence regarding the plaintiff's claim is substantially equal, the ABCMR and previous authorities had a statutory duty to apply the "benefit of the doubt doctrine."   The ABCMR did not determine that "the preponderance of the evidence weighs against the [plaintiff's] claim." See Clay v. Nicholson, No. 04-1134, 2006 WL 3200859, at *7 (Vet. App. June 7, 2004) citing Ortiz v. Principi, 274 F.3d 1361, 1365 (Fed. Cir. 2001) ("[W]hen the Board determines that the preponderance of the evidence weighs against the appellant's claim, as the Board did in this case, 'it necessarily has determined that the evidence is not 'nearly equal' or 'too close to call,' and the benefit of the doubt rule therefore has no application.").   Because the evidence does not preponderate against the plaintiff's claim, the ABCMR's failure to apply the "benefit of the doubt" doctrine was contrary to law.   Although the ABCMR's determination is due great deference, the court is obligated to overrule a determination that misapplies the law.   Accordingly, the ABCMR's determination is due to be remanded.

### D. Proper Relief

Finally, the defendant argues in the Motion for Summary Judgment that the relief sought by the plaintiff – judgment against the defendant in the sum of $25,000.00, interest, costs and attorneys' fees – is inappropriate.  The plaintiff's Cross Motion for Summary Judgment does not address the defendant's argument. The APA scope of review allows the court to "hold unlawful and set aside agency action[s]" that are arbitrary and capricious.  5 U.S.C. § 706(2).  It does not, however, extend to allow the court to grant monetary damages to the plaintiff.

### CONCLUSION

For the reasons set forth above, the court finds that the ABCMR's denial of the plaintiff's request for review was contrary to law, and therefore will vacate that decision and remand the matter to the ABCMR with instructions.  By separate Order, the defendant's Motion for Summary Judgment will be DENIED and the plaintiff's Motion for Summary Judgment will be GRANTED with regard to the conclusion that the ABCMR's determination was arbitrary and capricious, but DENIED to the extent that the plaintiff seeks monetary damages from this court. The cause will be REMANDED to the ABCMR, and the ABCMR will be DIRECTED to certify the eligibility of Mr. Yearwood for benefits as set forth in

his request for benefits, based on his inability to perform the ADLs of bathing and dressing.

DONE this 24th day of August, 2015.

_____

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE